## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **No. 23-54** |
| **MICHAEL CONNER ET AL.** | **SECTION I** |

## <u>ORDER & REASONS</u>

Before the Court are two motions[1] filed by defendants Michael Conner ("Conner") and Robert Hall ("Hall") (collectively, "defendants"). Both defendants move to suppress evidence discovered through a stop and search which they allege was unlawful. The government filed a combined opposition to the motions,[2] to which defendants replied.[3] On December 18, 2023 and January 4, 2024, the Court held evidentiary hearings with respect to the motions to suppress.[4] After the hearings concluded, the parties filed supplemental briefing with respect to the motions to suppress.[5] For the reasons set forth below, the Court denies both motions to suppress.

## I.    FACTUAL BACKGROUND

On March 24, 2023, defendants were indicted.[6] Count 1 of the indictment charges Conner with knowingly possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8), which proscribe possessing a firearm after being convicted

---

[1] R. Doc. Nos. 50 (Conner's motion), 52 (Hall's motion).

[2] R. Doc. No. 56.

[3] R. Doc. Nos. 73 (Hall's reply), 78 (Conner's reply).

[4] R. Doc. Nos. 79, 85.

[5] R. Doc. Nos. 89 (government's supplemental briefing), 90 (Hall's supplemental briefing), 91 (Conner's supplemental briefing).

[6] R. Doc. No. 17.

of a crime punishable by imprisonment for a term exceeding one year. Count 1 is based on Conner's prior convictions "for possession with intent to distribute less than 2.5 pounds of marijuana, in violation of Louisiana Revised Statute 40:966(B)(2)(a)," for "possession of cocaine less than two grams, in violation of Louisiana Revised Statute 40:967(C)(1)[,]" and "for possession with intent to distribute marijuana, in violation of Louisiana Revised Statute 40:966(B)(2)(a)."[7] Count 2 charges Hall with knowingly possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) based on his prior convictions "for attempted simple robbery, in violation of Louisiana Revised Statute 14:65(27)," for "simple robbery, in violation of Louisiana Revised Statute 14:65[,]" and "for being a convicted felon with a firearm, in violation of Louisiana Revised Statute 14:95.1."[8]

### a. RTCC Footage and Audio Recording

The indictment arises from conduct that occurred on March 7, 2023.[9] On that day, a New Orleans Police Department Detective, Chad Cockerham ("Detective Cockerham"), was conducting surveillance using a Real Time Crime Center ("RTCC") camera and relaying his observations to officers who later arrived at the scene. An audio recording captured Detective Cockerham's observations as he conducted the surveillance.

---

[7] *Id.* at 1–2.
[8] *Id.* at 2.
[9] *Id.* at 1–2.

The RTCC footage shows Conner sitting on the steps of a house with two other individuals, later identified as Joseph Pomfrey ("Pomfrey") and Perry Royal ("Royal"). Detective Cockerham notices Pomfrey carrying a firearm in his right pocket and communicates that information to the officers in the field.[10] Hall arrives shortly thereafter and is handed a firearm by one of the men sitting on the steps.[11] Detective Cockerham does not appear to notice the firearm handed to Hall, and he does not communicate to the other officers any information concerning the firearm handed to Hall.

The RTCC footage shows Pomfrey moving the firearm from his pocket into a black bag draped across his body.[12] The surveilling officer notices this and relays the new location of the firearm to the other officers.[13] While this is happening, the RTCC footage shows Hall getting cash from the other men and walking out of frame.[14] He returns shortly after holding food and drinks.[15] The group then walks down the street to a second residence.[16]

While they are walking, Detective Cockerham zooms in the camera on Conner's pants.[17] Detective Cockerham says Conner "possibly could be" carrying a firearm as

---

[10] R. Doc. No. 51, Ex. A-1, at 1:30.
[11] *Id.* at 2:58.
[12] *Id.* at 2:45.
[13] *Id.* at 3:20.
[14] *Id.* at 3:15.
[15] *Id.* at 5:03
[16] *Id.* at 5:18.
[17] *Id.* at 6:10.

well.[18] Detective Cockerham states that Conner's "joggers are sagging in the pocket area real, real low on the right-hand side."[19]

As the other officers are on the way to the scene, Detective Cockerham summarizes the information that he has gained through the surveillance. He says, "I know for a fact the target [Pomfrey] is 95.[20] There's another guy [Conner] out there in some red joggers that's possibly 95. There's another guy [Hall] that just popped out of a house in the past during the Mardi Gras season who we were watching. He was always 95. So that's three armed subjects that could possibly be right around this red vehicle."[21]

Shortly after, officers arrive on the scene.[22] As the officers approach, the four men stand and place their hands in the air.[23] The RTCC footage shows the men being put in handcuffs. Conner can be seen being placed face down on the hood of the car and handcuffed.[24]

---

[18] *Id.* at 6:12.
[19] *Id.* at 6:15.
[20] Detective Cockerham testified that "95" is a signal for a violation of Louisiana Revised Statute § 14:95, which is the Louisiana statute regarding the illegal carrying of weapons.
[21] R. Doc. No. 51, Ex. A-1, at 14:30.
[22] *Id.* at 23:30.
[23] *Id.* at 23:35.
[24] *Id.* at 24:00.

### b. Body Camera Footage

Additional footage from March 7, 2023 is captured by the officers' body cameras.[25] Officer Arden Taylor's ("Officer Taylor") body camera footage captures the stop and search of Conner. Within a period of fifteen seconds, Officer Taylor approaches Conner, grabs his left arm, touches the outside of his right pocket, reaches into his right pocket, and removes a handgun.[26] Officer Taylor places Conner face down on the hood of a car and then handcuffs him.[27] Before placing Conner in a police cruiser, Officer Taylor and another officer conduct a search of Conner.[28]

Officer Carey Jordan's ("Officer Jordan") body camera footage captures the search of Hall.[29] The footage shows Officer Jordan approaching and standing in front of Hall.[30] Officer Jordan's hands are out of the frame for most of the footage. Officer Aaron Muse ("Officer Muse") can be seen standing behind Hall.[31]

Officer Muse's body camera footage captures another perspective of the search of Hall.[32] Officer Muse approaches Hall and grabs Hall's arms while standing behind him.[33] Officer Muse and Officer Jordan both reach for the outside of Hall's right

---

[25] Officer Brown's body camera footage captures the officers' stop and search of Royal. This footage was submitted as evidence. However, Royal is not a defendant in this action and the footage is not relevant to the motions presently before the Court.
[26] R. Doc. No. 51, Ex. A-4, at 2:00.
[27] *Id.* at 2:20.
[28] *Id.* at 3:15.
[29] R. Doc. No. 64, Ex. 12.
[30] *Id.* at 0:05.
[31] *Id.* at 0:06.
[32] R. Doc. No. 64, Ex. 13.
[33] *Id.* at 0:29.

pocket.[34] Officer Jordan moves Officer Muse's hand away and appears to search Hall's right pocket.[35] Officer Muse then places Hall in handcuffs.[36] Officer Jordan can be seen holding a firearm that he presumably removed from Hall's right pocket.[37]

### c. Officer Testimony

The Court heard testimony from Detective Cockerham and Officer Taylor at the hearing on December 18, 2023. The Court heard additional testimony from Officer Muse at the hearing on January 4, 2024.

### i. Detective Cockerham

Detective Cockerham, who has been employed by the New Orleans Police Department since 2009 and has been assigned to the Federal Bureau of Investigation since 2018,[38] testified regarding the surveillance that he conducted as well as his assessment of this area as a "high-crime area." Detective Cockerham further testified about his awareness of crime within Zone A, Subzone 3 of the Fifth Police District, where the stop on March 7, 2023 occurred, and the problems they experienced in that area, "from shootings to drug activity to people carrying firearms."[39]

Detective Cockerham also testified about the RTCC surveillance that he conducted on February 18, 2023, during which he observed Hall playing dice, removing a firearm from his waistband, and placing the firearm on the ground "no

---

[34] *Id.* at 0:35.
[35] *Id.*
[36] *Id.* at 0:45.
[37] *Id.* at 0:47.
[38] R. Doc. No. 87, at 5:2.
[39] *Id.* at 18:2–19:24.

6

more than maybe five to eight feet" from a child.[40] Detective Cockerham subsequently observed Hall moving the firearm to the grass "within two steps of [the] child."[41] Detective Cockerham testified that this incident was relevant to the stop on March 7, 2023 because "Hall [ ] appear[ed] to be very comfortable in front of this residence," which meant "[t]hat residence could possibly, potentially be a harmful element to the team."[42]

Detective Cockerham also testified regarding his RTCC surveillance of an alleged hand-to-hand narcotics transaction that he observed occurring on February 19, 2023 outside the same residence where the stop on March 7, 2023 occurred.[43] Detective Cockerham explained that this interaction contributed to the information officers "had of the people soliciting and [selling] illegal narcotics within the specific area."[44]

Detective Cockerham described his observations on March 7, 2023. Detective Cockerham explained that he saw Pomfrey take a firearm and place it in a bag draped across his body.[45] According to Detective Cockerham, the weapon was fully concealed, which is a violation of Louisiana law, so an investigatory team was called to the scene.[46] Detective Cockerham testified that Hall was handed a firearm, but he did

---

[40] *Id.* at 23:5–24:4.

[41] *Id.*

[42] *Id.* at 24:15–25:8.

[43] *Id.* at 25:22–26:17.

[44] *Id.* at 26:24–27:1.

[45] *Id.* at 32:24–33:5.

[46] *Id.*

not notice or communicate that this exchange occurred.[47] Detective Cockerham explained that, at this point, the investigation was focused on Pomfrey.[48]

As the men began walking around the corner towards the residence observed on February 18, 2023, Detective Cockerham testified that he noticed the right pocket of Conner's sweatpants "flopping back and forth."[49] Detective Cockerham stated that he could see a large object that was weighted and, as he zoomed the camera in closer, he "could obviously see the L shape, which is consistent [with] a firearm."[50] In the surveillance audio, Detective Cockerham said Conner "possibly" could be armed. At the hearing, Detective Cockerham testified that he used the word "possibly" to indicate that, while his training and experience led him to believe the object was a firearm, he "had not laid eyes on the actual firearm."[51]

Detective Cockerham also testified that he believed that Conner did not have a concealed weapons permit because of "the way that weapon was negligently possessed" in his pocket where it could discharge at any time and in any direction.[52] Additionally, Detective Cockerham explained that, in his experience with hundreds of investigations based on reasonable suspicion of a concealed weapon, he has never encountered someone with a concealed weapons permit.[53]

---

[47] *Id.* at 33:14–16.
[48] *Id.* at 33:24–34:1.
[49] *Id.* at 34:25.
[50] *Id.* at 35:1–35:4.
[51] *Id.* at 35:22–36:1.
[52] *Id.* at 37:2–25.
[53] *Id.* at 38:12–13.

Detective Cockerham testified that once the men reached the residence where the alleged narcotics transaction had previously occurred, his view of the men was obstructed by a vehicle.[54] Because of this, he explained that he could not see the vulnerabilities of the situation in order to relay potential dangers to the officers arriving on the scene.[55]

Detective Cockerham also testified that he notified the officers who would arrive on the scene that Hall had possessed a weapon at this same location a few weeks prior.[56] Detective Cockerham stated that Hall was a target of the investigatory stop conducted by the officers.[57] During the hearing, Detective Cockerham also reviewed the body camera footage of the officers on the scene and described the operation that occurred.[58]

### ii.  Officer Taylor

Officer Taylor, who has been with the New Orleans Police Department for seven years and currently works in the Special Operations Division where he received specialized training on high-risk search warrants and proactive work concerning drugs and guns,[59] testified concerning the stop, frisk, and detention/arrest of Conner.

Officer Taylor explained how, when officers arrive on a scene, an "overwhelming show of force" allows them to make the scene safer by discouraging

---

[54] *Id.* at 41:1–5.
[55] *Id.* at 41:6–12.
[56] *Id.* at 46:25–47:1.
[57] *Id.* 47:11–47:12.
[58] *Id.* at 50–56.
[59] *Id.* at 124:25–125:10.

flight.[60] He testified that this is why many officers arrived on the scene on March 7, 2023.[61] Officer Taylor also explained the dangers associated with suspects fleeing with firearms.[62]

In his experience, including more than one hundred stops for reasonable suspicion of concealing a weapon, Officer Taylor testified that only once did the suspect produce a permit to show that he was lawfully carrying the weapon.[63] In that encounter, the suspect informed the officers that he had a permit while the officers were approaching him.[64] Similar to Detective Cockerham, Officer Taylor underscored that carrying a firearm in one's pocket is a negligent way to carry a firearm because the trigger is exposed and can discharge if pulled.[65]

During the stop on March 7, 2023, Officer Taylor immediately approached Conner, who had placed his hands in the air. Officer Taylor testified that Detective Cockerham had made a lot of similar arrests and therefore Officer Taylor thought it was very likely that Detective Cockerham was correct that Conner had a weapon.[66] Officer Taylor stated that "[b]efore [he] went to [conduct] the frisk, [he] could see . . . exactly what Detective Cockerham saw."[67] Officer Taylor testified that once he reached Conner, he "did a pat down of [Conner's] right side where the firearm was

---

[60] *Id.* at 125:24–126:13.
[61] *Id.* at 137:19–138:9.
[62] *Id.* at 128:23–25.
[63] *Id.* at 127:1.
[64] *Id.* at 127:13–14.
[65] *Id.* at 129:11–15.
[66] *Id.* at 149:5–7.
[67] *Id.* at 149:21–23.

described to be and [he] felt what [he] knew to be a firearm."[68] Officer Taylor testified that Conner never stated that he had a permit to validly conceal the weapon.[69]

At that point, Officer Taylor placed Conner in handcuffs and ran his name through CASTNet.[70] Officer Taylor testified that he was under arrest for illegally carrying a firearm in violation of Louisiana Revised Statute § 14:95 when he was placed in handcuffs.[71] Later in his testimony, Officer Taylor clarified that Conner was being detained while they investigated whether he had a permit.[72] He testified that the handcuffs were necessary because Conner could be a flight risk and the situation was dangerous, considering there were four suspects who needed to be assessed.[73] In running Conner's name through CASTNet, the officers discovered that he was a felon and therefore was illegally in possession of a firearm in violation of Louisiana Revised Statute § 14:95.1.[74]

### iii.  Officer Muse

Officer Muse, who has worked for the New Orleans Police Department for four years and is currently a part of the SWAT unit,[75] testified regarding the stop, frisk, and detention/arrest of Hall. Officer Muse testified that the area that Conner and Hall were stopped in was "pretty violent" and had "a lot of drug activity."[76] Officer

---

[68] *Id.* at 131:5–7.
[69] *Id.* at 131:11–12.
[70] *Id.* at 131:16–19.
[71] *Id.*
[72] *Id.* at 131:10–12.
[73] *Id.* at 159:6–12.
[74] *Id.* at 131:25–132:1.
[75] R. Doc. No. 88, at 4:24–5:2.
[76] *Id.* at 6:12.

Muse testified that, on March 7, 2023, the officers were confronting two individuals whom Detective Cockerham had described as armed.[77] Ten to twelve officers arrived on the scene, which Officer Muse explained was typical because a higher number of officers makes it safer for the officers, the suspects, and the public.[78]

When Officer Muse arrived on the scene, he approached Hall. Officer Muse testified that he observed a bulge in Hall's pocket and, once he got closer, he could see the end of the firearm in Hall's pocket.[79] Officer Muse testified that the firearm was fully concealed in Hall's pocket but, because of the angle at which the firearm was resting, the pocket flared opened enough that he could see the end of the firearm.[80]

Officer Muse testified that he and Officer Jordan patted the area where they believed the firearm to be and confirmed it was a firearm.[81] Officer Jordan then removed the firearm, and Officer Muse placed Hall in handcuffs.[82] The officers then ran a search of Hall in CASTNet and discovered Hall had prior felony convictions.[83] Because of Hall's convictions, Officer Muse testified that they knew that Hall was not lawfully carrying the firearm.[84]

---

[77] *Id.* at 7:24–8:2.
[78] *Id.* at 8:5–13.
[79] *Id.* at 9:7–11.
[80] *Id.* at 32:25–33:7.
[81] *Id.* at 18:1–6.
[82] *Id.*
[83] *Id.* at 21:12–16. Officer Muse testified that, out of all of the stops he has made for reasonable suspicion of a concealed weapon, only once has the individual ever had a permit. *Id.* at 20:21.
[84] *Id.* at 21:12–22:7.

## II.  STANDARD OF LAW

"Warrantless searches and seizures are presumptively unreasonable, subject to certain exceptions." *United States v. McKinney*, 980 F.3d 485, 490 (5th Cir. 2020) (citing *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). "The government bears the burden of showing the reasonableness of a warrantless search or seizure." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (citing *United States v. Jaquez*, 421 F.3d 338, 341 (5th Cir. 2005)).

One exception to the warrant requirement, first articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), permits officers to conduct "an investigatory stop (temporary detention) and frisk (patdown for weapons). . . if two conditions are met." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). First, the investigatory stop must be supported by a reasonable suspicion "that the person apprehended is committing or has committed a criminal offense." *Id.* "Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Id.* at 326–27. "The search is 'a limited protective search for concealed weapons,' not a search to discover evidence of a crime." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 209 (5th Cir. 2009) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).

Reasonable suspicion to support an investigatory stop exists if the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  "[S]pecific and articulable facts" must give rise to a reasonable suspicion. *Monsivais*, 848 F.3d at 357.

Assuming the initial stop was lawful, "[i]n order to ensure their safety during the stop, police may frisk the subject for weapons that they reasonably suspect he may carry." *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010). "An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on 'specific and articulable facts,' that his safety or that of others is in danger." *United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008) (quoting *United States v. Michelletti*, 13 F.3d 838, 840–41 (5th Cir. 1994)). "The standard 'permit[s] officers to make commonsense judgments and inferences about human behavior.'" *United States v. Thomas*, 997 F.3d 603, 610 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 828 (2022) (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020)).

To determine whether reasonable suspicion exists, "[t]he correct approach under *Terry* is to objectively examine the 'totality of the circumstances.'" *Tuggle*, 284 F. App'x at 223. "[I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22. "The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From [this] data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981). "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary

human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985).

"[R]easonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation. The collective knowledge theory for reasonable suspicion applies so long as there is 'some degree of communication' between the acting officer and the officer who has knowledge of the necessary facts." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013).

"[I]f unjustifiably prolonged, a *Terry* stop 'can, due to its duration, transform into the equivalent of an arrest.'" *Smith v. Heap*, 31 F.4th 905, 911 (5th Cir. 2022) (quoting *United States v. Massi*, 761 F.3d 512, 522 (5th Cir. 2014)). The analysis of whether the actions of the officers "exceeded the scope of a proper *Terry* stop is directed by the principle that officers are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *Thomas*, No. 997 F.3d at 615.

"[U]sing some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do not automatically convert an investigatory detention into an arrest requiring probable cause." *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993); *see also Thomas*, 997 F.3d at 615 (citing *United States v. Abdo*, 733 F.3d 562, 565–66 (5th Cir. 2013) as holding that, in a *Terry* stop case, "it was reasonable to detain a suspect at gunpoint, handcuff the suspect, and place the suspect in a police car"). "The

relevant inquiry is always one of reasonableness under the circumstances." *Sanders*, 994 F.2d 200, 206.

## III.   ARGUMENT

### a.  Stop and Search of Conner

Conner first argues that "sagging sweatpants do not give rise to reasonable suspicion that a person is committing a crime."[85] As mentioned previously, pursuant to *Terry*, reasonable suspicion depends on an objective analysis of the "totality of the circumstances." *Tuggle*, 284 F. App'x at 223. Specific and articulable facts must give rise to reasonable suspicion "that the person apprehended is committing or has committed a criminal offense." *Johnson*, 555 U.S. at 326.

Conner argues that, based on *United States v. Cooper*, 43 F.3d 140, 147 n.9 (5th Cir. 1995), a bulge in a pocket is not enough to warrant a reasonable suspicion. In *Cooper*, the Fifth Circuit explained that "a large bulge located in . . . an unusual place on a suspect may be a factor warranting reasonable suspicion." *Id*. Conner notes that a pocket is "a quite usual location" to carry items and it is not clear that a sagging pocket has any significance.[86] Conner also cites *United States v. Wright,* 582 F.3d 199, 212 (1st Cir. 2009), where the U.S. First Circuit Court of Appeals explained that the defendant clutching something heavy in his pocket during flight did not support the inference that he was carrying a weapon as opposed to something else.

---

[85] R. Doc. No. 51-1, at 21.
[86] *Id.*

16

In response, the government argues that an experienced officer, based on his training, experience, and the totality of the circumstances, could infer that the item in Conner's pocket was a handgun.[87] The government relies on multiple cases to support its argument.

Unlike in *Wright* and *Cooper*, the stop of Conner was not based solely on Conner having an object in his pocket or that object being heavy. Rather, Detective Cockerham testified that he "could obviously see the L shape which is consistent [with] a firearm."[88] Detective Cockerham also testified that he had received training in identifying firearms, including in situations where the firearm was placed in a pocket of jogging pants like Conner was wearing.[89] Based on his observation about the shape, size, and weight of the object,[90] Detective Cockerham communicated to the officers in the field that Conner was "possibly" carrying a concealed weapon. Detective Cockerham testified that he used the word "possibly" because he "had not laid eyes on the actual firearm," but believed, "based on [his] training and experience," that the object was a firearm.[91]

Officer Taylor, who conducted the stop, frisk, and search of Conner, testified as to his reliance on Detective Cockerham's statements about Conner possibly possessing a concealed firearm. Officer Taylor stated that he relied on Detective

---

[87] R. Doc. No. 56, at 11.
[88] R. Doc. No. 87, at 34:23–35:4.
[89] *Id.* at 36:17–23.
[90] *Id.*
[91] *Id.* at 35:22–36:1.

Cockerham's assessment because Detective Cockerham has "made a lot of these arrests" and when "he thinks somebody might have a firearm, it's very likely that he is going to be correct."[92] He further testified that Detective Cockerham's use of the word "possibly" instead of making a statement like "I believe he is 95" was "semantics."[93]

Additionally, Officer Taylor explained that before he frisked Conner, he saw what Detective Cockerham had been communicating and he agreed with Detective Cockerham's assessment that the object in Conner's pocket was a firearm because of the bulge's L-shape.[94] Officer Taylor explained that the way that Conner was carrying a firearm, i.e. loose in his pocket, indicated that he likely did not have a permit.[95] Therefore, Officer Taylor had reasonable suspicion that Conner was committing a crime by carrying a concealed firearm.

Conner next argues that because Louisiana law makes carrying a concealed firearm "presumptively legal," the presence of a concealed firearm cannot provide reasonable suspicion.[96] As stated in *Wilson*, "[t]he Court has not identified any Fifth Circuit case law addressing whether the fact that a person was carrying a concealed firearm is, alone, enough to arouse reasonable suspicion to justify a *Terry* stop." *United States v. Wilson*, No. CR 22-92, 2023 WL 3601590, at *4 (E.D. La. May 23,

---

[92] *Id.* at 149:5–7.
[93] *Id.* at 149:12.
[94] *Id.* at 149:21–23, 150:14–16. Officer Taylor also testified that, once he frisked Conner, he felt the firearm *Id.* at 149:25–150:2, 151:24–152:2.
[95] *Id.* at 129:11–15.
[96] R. Doc. No. 51-1, at 24.

2023) (Africk, J.). However, "[i]n general, courts have held that, where carrying a firearm is 'presumptively illegal,' possession of a firearm may, on its own, support a *Terry* stop." *Id.*

This analysis is consistent with the analysis adopted by the Eighth Circuit, Eleventh Circuit, Sixth Circuit, and Third Circuit. For example, the Eighth Circuit has held that an "officer had reasonable suspicion that criminal activity was afoot when he personally observed [an individual] place the gun in his waistband" in Iowa, where carrying a concealed weapon is a criminal offense unless one has a license to do so.[97] *United States v. Pope*, 910 F.3d 413, 415–16 (8th Cir. 2018). The Eighth Circuit further explained that the Supreme Court has "authorized police officers to frisk a suspect reasonably believed to be armed even where it could be that the suspect possesses the arms legally" because the purpose of a *Terry* frisk is to "allow the officer to pursue his investigation without fear of violence," which may make a frisk necessary regardless of whether the concealed weapon violates state law. *Id.* at 416.

Similarly, the Eleventh Circuit held that, pursuant to Florida law which makes the possession of a permit an affirmative defense, an individual's admission that he was carrying a concealed weapon "was sufficient to justify briefly stopping him before

---

[97] As this Court noted in *Wilson*, "Iowa law has since been amended so that a permit is not generally required to carry a concealed weapon." *Wilson*, 2023 WL 3601590, at *5 n.48. However, in *Pope*, the Eighth Circuit was interpreting the law which, at the time, made carrying a concealed weapon in Iowa a criminal offense and possession of a permit an affirmative defense. *Pope*, 910 F.3d at 415–16

19

inquiring further about whether he had an affirmative defense in the form of a valid concealed-weapons permit." *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012). "The Supreme Court has made it abundantly clear that, although an individual may ultimately be engaged in conduct that is perfectly lawful . . . officers may 'detain the individual[ ] to resolve the ambiguity.'" *Id.* (quoting *Wardlow*, 528 U.S. at 125).

The Sixth Circuit and the Third Circuit have reached similar conclusions. *See United States v. Galaviz*, 645 F.3d 347, 356 (6th Cir. 2011) (explaining that in Michigan "it is a crime to carry a pistol in a vehicle without a firearm license," and therefore "the incriminating nature of a handgun in the vehicle [is] immediately apparent."); *United States v. Gatlin*, 613 F.3d 374 (3d Cir. 2010), *as amended* (Oct. 22, 2010) ("[U]nder Delaware law, carrying a concealed handgun is a crime to which possessing a valid license is an affirmative defense, and an officer can presume a subject's possession is not lawful until proven otherwise.").

"Louisiana law prohibits '[t]he intentional concealment of any firearm, or other instrumentality customarily used or intended for probable use as a dangerous weapon, on one's person' and provides that this prohibition 'shall not apply to a person with a valid concealed handgun permit.'" *Wilson*, 2023 WL 3601590, at *5; La. Rev. Stat. Ann. § 14:95(A)(1)(a), (b). In *Wilson*, this Court explained that "Louisiana law makes the carrying of a concealed firearm 'presumptively unlawful.'" *Wilson*, 2023 WL 3601590, at *5. Accordingly, possession of a valid permit is an affirmative defense in Louisiana. Therefore, Officer Taylor had reasonable suspicion that Conner was committing a crime, which justified the initial stop of Conner.

20

Additionally, Officer Taylor had reasonable suspicion that Conner was armed and dangerous, permitting the frisk of Conner's pocket. As the Fourth Circuit explained, pursuant to Supreme Court precedent, "the legality of the frisk does not depend on the illegality of the firearm's possession." *United States v. Robinson*, 846 F.3d 694, 701 (4th Cir. 2017). Rather, "[t]he danger justifying a protective frisk arises from the combination of a forced police encounter and the presence of a weapon, not from any illegality of the weapon's possession." *Id.* at 696. In addition to testifying regarding his knowledge that Conner was likely armed, Officer Taylor testified concerning the safety risks to officers when approaching groups of individuals who are suspected to be armed.[98] Officer Taylor also testified that there were moments where the officers could not see all four men, which made it possible for the men to be in possession of additional firearms of which the officers were unaware.[99]

Officer Taylor, as well as Officer Muse and Detective Cockerham, also testified regarding the criminal activity in the area. Defendants dispute the characterization of the area as "high crime" and argue that the government's evidence is not specific enough.[100] The government presented evidence showing there were 1,200 calls for service in Zone A, Subzone 03 within a one-year period.[101] The subzone encompasses a four-by-seven block area.[102] Defendants argue that this data is not significant

---

[98] *Id.* at 138:18–22.
[99] *Id.* at 139:2–3.
[100] R. Doc. No. 78, at 6; R. Doc. No. 73, at 4.
[101] R. Doc. No. 87, at 14:20–21.
[102] *Id.* at 14:2–10.

because the data shows, on average, only 0.2 calls per day for serious offenses.[103] However, at the hearing, Detective Cockerham explained that calls for service do not reflect everything that is going on in an area.[104] Specifically, the data does not include tips received by officers, information provided by concerned citizens, and observations made by officers, like Detective Cockerham observing Hall with a firearm in February and observing an alleged narcotics transaction outside the residence where Hall and Conner were arrested.[105]

As the Supreme Court has explained, "[a]n individual's presence in a 'high crime area,' standing alone, is not enough to support a reasonable, particularized suspicion of criminal activity, but a location's characteristics are relevant in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 119. "The fact that law enforcement officers know a particular area to be high in crime is indeed a 'relevant contextual consideration.'" *United States v. Hill*, 752 F.3d 1029, 1035 (5th Cir. 2014). The officers' credible testimony regarding their experience with crime in the area and the surveillance footage of alleged criminal activity occurring outside the same residence where the indicted conduct occurred are therefore relevant contextual considerations, even though these considerations alone do not provide reasonable suspicion.

---

[103] R. Doc. Nos. 90 at 7, 91, at 16.
[104] R. Doc. No. 87, at 108.
[105] *Id.* at 118:10–24. 19:25–20:5.

Based on the specific and articulable facts set forth in the officers' testimony, which the Court finds to be credible, including Officer Taylor's observation that Conner was likely armed, the safety risks to officers and bystanders, the number of suspects, and their proximity to a residence, Officer Taylor had reasonable suspicion to believe that Conner was armed and dangerous and therefore the frisk of Conner did not violate the Fourth Amendment.

Conner asks the Court to consider the Second Amendment implications of holding that possession of a concealed weapon justifies a *Terry* stop and frisk.[106] Specifically, Conner argues that such a holding "would effectively eliminate Fourth Amendment protections for lawfully armed persons exercising their Second Amendment rights in accord with state law."[107] However, as mentioned, the Supreme Court has recognized that "although an individual may ultimately be engaged in conduct that is perfectly lawful . . . officers may 'detain the individual[ ] to resolve the ambiguity.'" *Lewis*, 674 F.3d at 1304 (quoting *Wardlow*, 528 U.S. at 125). The Supreme Court has made clear that "[t]he touchstone of the Fourth Amendment is reasonableness." *Samson v. California*, 547 U.S. 843, 855 n.4 (2006). It is reasonable for officers to conduct stops and searches in light of the "substantial, immediate danger" caused to officers by "the known possession of [ ] firearms." *See Lewis*, 674 F.3d at 1306.

---

[106] R. Doc. No. 51-1, at 34.
[107] *Id.* at 36.

Regardless, Conner and Hall were not validly exercising a Second Amendment right to bear arms. *See United States v. Bazile*, No. CR 23-34, 2023 WL 7112833 (E.D. La. Oct. 27, 2023) (Africk, J.) (rejecting the argument that 18 U.S.C. § 922(g)(1) violates the Second Amendment). Accordingly, it is not necessary for the Court to address the intersection of the Fourth Amendment and the valid exercise of the Second Amendment.

Conner also argues that, even if the initial stop was justified, the officers exceeded the scope of the stop by grabbing Conner, searching his pocket, placing him on the hood of the car, and handcuffing him without first asking Conner if he was armed or had a concealed carry permit.[108] Conner asserts that he was arrested without probable cause because possessing a firearm is not itself a criminal offense.[109]

The government argues that once the firearm was found, the officers had probable cause to believe Conner had committed the crime of carrying a concealed weapon and therefore could detain or arrest him while investigating whether he had a concealed carry permit.[110] The government also argues that, regardless of whether the officers' actions are considered a temporary detention or an arrest, the officers' actions were reasonable.[111]

As discussed, Officer Taylor had sufficient reasonable suspicion to frisk Conner. After discovering the concealed weapon, the officers had probable cause to

---

[108] *Id.* at 31.

[109] *Id.*

[110] R. Doc. No. 89, at 2.

[111] R. Doc. No. 56, at 14.

believe that Conner was committing an offense pursuant to Louisiana law by possessing a concealed weapon. If Conner had possessed a permit, the permit would have provided him with an affirmative defense. The officers acted reasonably under the circumstances to ensure their safety, the safety of the suspects, and the safety of potential bystanders.

### b.  Stop and Search of Hall

As noted previously, while Hall was in possession of a firearm, the surveilling officer did not notice Hall being handed that firearm. Therefore, as the government admits, that information "cannot be used as reasonable suspicion."[112]

Hall argues that the officers lacked a justification for stopping him pursuant to *Terry*.[113] He asserts that the only justification for stopping him was that he had possessed a weapon "during the Mardi Gras season" weeks prior, which Hall argues amounts to nothing more than a "hunch" that he was carrying a weapon on March 7, 2023.[114] Hall further argues that the officers had no particularized suspicion justifying a frisk and that the search of Hall violated constitutional restrictions because officers did not conduct a protective pat-down and instead reached directly into his pockets.[115]

---

[112] R. Doc. No. 56, at 16.
[113] R. Doc. No. 53-1, at 4.
[114] *Id.*
[115] R. Doc. No. 53-1, at 5.

Officer Muse testified that when the officers arrived on the scene, it was "readily apparent" that Hall possessed a firearm.[116] The government argues that this is reflected in the body camera footage where Officer Muse and Officer Jordan both immediately frisk Hall's right pocket where the firearm was located.[117] Based on this testimony, the government argues that the frisk was justified because the officers had reasonable suspicion that Hall was illegally concealing a firearm.[118] The government also argues that the frisk was justified given the potentially volatile situation, Hall having possessed a gun two weeks earlier, the other men being armed, the high crime area, and the unknown people who might be nearby and associated with Hall.[119]

In his supplemental briefing, Hall argues that the officers were going to treat Hall as armed and stop and search him anyway based on Detective Cockerham's testimony. However, the Fourth Amendment inquiry is based on reasonableness at the time of the search and seizure. The Fourth Amendment inquiry does not look to an officer's subjective intentions, but rather "in making th[e] [reasonableness] assessment[,] it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).

---

[116] R. Doc. No. 88, at 9:10.
[117] R. Doc. No. 89, at 2.
[118] *Id.* at 3.
[119] R. Doc. No. 56, at 18–19.

At the time that Hall was seized, Officer Muse had already observed a bulge in Hall's pocket that he, based on his training and experience, believed to be a firearm. Furthermore, as he approached Hall, Officer Muse saw the end of the firearm in Hall's pocket. These facts provided reasonable suspicion that Hall was committing a crime by carrying a concealed firearm, which justified the stop of Hall. Additionally, as explained concerning the search of Conner, the "readily apparent" presence of a concealed firearm, along with specific factors like the danger to officers of approaching a group of potentially armed suspects, Hall previously being seen with a firearm, and Hall's association with the residence, provided officers with reasonable suspicion that Hall was armed and dangerous. The Court need not inquire into Officer Muse's subjective intentions nor the hypothetical situation that might have occurred had Officer Muse not observed the firearm.

Like Conner, Hall also argues that possession of a concealed weapon does not give officers reasonable suspicion or probable cause pursuant to Louisiana law.[120]  In response, the government asserts that, after the officers found the gun, they had probable cause to believe Hall was violating Louisiana law and could detain him while investigating.[121] As analyzed already, the presence of a concealed firearm gave the officers probable cause to believe a crime was being committed.

In his supplemental briefing, Hall argues that, based on Officer's Muse's testimony, the weapon was not concealed and there was no reasonable suspicion that

---

[120] R. Doc. No. 53-1, at 7.
[121] R. Doc. No. 56, at 18–19.

Hall had committed a crime.[122] However, this argument misconstrues Officer Muse's testimony. Officer Muse testified that the weapon was concealed in Hall's pocket and, from the outline of the object, he knew it to be a firearm.[123] Then, as Officer Muse approached and Hall turned in such a way that his pocket flared open, Officer Muse could see the end of the firearm.[124]

Hall relies on a case where the Louisiana Supreme Court explained that "[b]y making the offense of concealment a crime of specific intent, the legislature has abandoned the old rule that a partially hidden weapon is a concealed weapon in favor of a more realistic proscription that contemplates that a weapon, although not in 'full, open view,' is nonetheless not a 'concealed' weapon if it is sufficiently exposed to reveal its identity." *State v. Fluker*, 311 So. 2d 863, 866–67 (La. 1975). The Louisiana Supreme Court proceeded to explain that "[t]he appropriate test to be applied in prosecutions for illegal carrying of weapons is whether, under the facts and circumstances of the case as disclosed by the evidence, the manner in which defendant carried the weapon evinced an intent to conceal its identity." *Id.* at 866.

In *Fluker*, unlike the present case, the defendant was carrying a firearm in "a holster on his hip in open view." *Id.* The *Fluker* court explained that there was no attempt to conceal its identity. *Id.* In the matter currently before this Court, Hall had placed the firearm entirely in his pocket. The concealed nature is not negated by the

---

[122] R. Doc. No. 90, at 16.
[123] R. Doc. No. 88, at 33:9–10.
[124] *Id.* at 33:3–7.

fact that an experienced offer could identify the firearm based on seeing the bulge in his pocket and the very end of the gun when Hall's pocket flared open. It was reasonable for Officer Muse to conclude that Hall was carrying a concealed firearm, and it was reasonable for him to conduct a frisk on that basis.

## IV.   CONCLUSION

Accordingly,

**IT IS ORDERED** that defendants' motions to suppress are **DENIED.**

New Orleans, Louisiana, January 30, 2024.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**